Mr. Whitburn, whenever you're ready. May it please the Court, Mark Whitburn for the Plaintiff's Appellants. Between October 19, 2009 and May 7, 2010, Defendant Donald Dunn assaulted at least ten female immigrant detainees while driving them from the Hutter Detention Facility near Austin, Texas to either the Austin Airport or the Austin Bus Station. Eight of these women are plaintiffs in this case. He drove these women in the very early morning hours down unlit roads and would stop at a deserted gas station or other similarly isolated spots to carry out his assaults. The women that he transported generally spoke no English. They had no knowledge of the geographical area, the culture, the legal system, and were even more vulnerable in light of their status as undocumented persons afraid of deportation if they resisted in any way. Furthermore, they viewed Donald Dunn as an authority figure as he was someone who had worked as an authority at the Hutter facility, was wearing his uniform, and was driving an official van during these transports. They were locked in the caged back of these vans and could not get out unless Dunn allowed it. Generally, these women were highly vulnerable to Donald Dunn if he chose to abuse his authority, and he did. Dunn was able to abuse his authority and to assault the plaintiffs and other similarly situated women precisely because he was driving them without any other official present. He drove them alone despite the fact that mechanisms existed precisely to prevent that from happening by requiring that transports not be carried out of female detainees with unaccompanied male transport drivers. The United States Immigration and Customs Enforcement contracts with Williamson County in Texas to detain the women in question. Williamson County in turn contracts with CCA, Corrections Corporation of America, a private prison corporation, to detain these women at the Hutter facility. The contract contains, the contract between ICE and Williamson County, contains an express provision requiring that during all transportation activities, at least one transportation officer shall be of the same sex as the residents being transported. The Williamson County contract with CCA incorporates the federal contract including this provision. Nevertheless, despite the existence of this provision and defendants' awareness that the recognition of the special vulnerability of female immigrant detainees and the need to protect them against the sort of assaults committed by Donald Dunn, defendants ignored the provision and routinely permitted male drivers to transport female detainees without any other accompaniment. Let me ask you this, it's obviously terrible what happened and I know he's been prosecuted in both the state and federal arena. In terms of the civil remedy, there's basically a double delegation. The feds delegate it to Williamson County, Williamson County delegates to this private company and part of your brief is saying, well, you know, this double delegation creates this world where it's basically impossible if you accept what the district court did to attach any civil liability. But doesn't the delegation actually provide a more straightforward remedy because if we're in the normal situation where ICE was operating a regular detention center and this happens, the only remedy would have been a Bivens claim against the guards and the supervisors, deliberate indifference, very high standard, engrafted on top of that qualified immunity. I mean, you saw in the first appeal how tough a standard that is. Here because it's been delegated down to a private company, you have just straight up state law negligence claims against Ms. Hernandez, a negligent supervision against CCA. So it seems to me that this double delegation has actually resulted in an easier remedy. Why do you think it's created a situation where it's so difficult for your clients to get some civil redress? The argument that plaintiffs make in the brief is not that it would be difficult to get any civil redress. The argument in the brief is that the plaintiffs are unable to specifically get redress for violations of their constitutional rights. So it's absolutely the case that plaintiffs have sued on state law claims and are trying to obtain recovery on those state law claims. But I mean, the ultimate issue is your clients want then compensation. And so if there's, I mean, state law torts are generally easier to prove than constitutional claims. And that brings us to this question of the state law torts, which is the district court throw those out on supplemental grounds saying there's no federal question and he didn't realize there was potentially diversity. Why didn't you ask for reconsideration of that? Because that seems to me, I think as you say in your brief, he just missed that there was a diversity allegation in the complaint. That's the classic situation. It's not that the judge disagreed with your arguments and well, reconsideration is probably futile. I mean, if the district court just misses something, why not ask for reconsideration? It can get fixed. Your clients who've been, this has been going on for years, I mean, they want to get to the end of this thing. You know, now they're facing a lengthy appeal. You've asked two questions there, I'll take the first. In terms of not relying entirely on state court liability or the liability imposed by state law, I think the answer is in part that that only covers some defendants, that not all defendants are subject to liability under state law. The second issue is that I think it is dangerous to rely on the vagaries of state laws in trying to protect civil rights, that generally speaking, one of the whole ideas of federal civil rights law is that there be uniform standards across the states and that plaintiffs who are trying to obtain remedy do not have to rely on the particular state laws of the, to seek a remedy for violations of their constitutional rights. With respect to the issue of why not just go back to the district court below and say, hey, you didn't see the jurisdictional issue. I think the reason is that we had, it's not so simple as to say that, well, you face a appeal and then you go back, and then you're going to go back down and do the jurisdictional question. I think we face a lengthy appeal anyway because the district court had thrown out all these federal claims. So if the, if we had gone back to the district court and said, get the jurisdictional question right, then we could reasonably anticipate coming back before this court on the other issues anyway. So our view was, let's get all the issues decided before trial since, you know, the other option would be we may have two trials if, you know, if this court reinstated some of these other claims when we had to go back down. Counsel, you have a lot of ground to cover. Let me ask you to at least start with the Federal Tort Claims Act discretionary function, how that should work in this case, the mere existence of a constitutional violation being sufficient or not, clearly established, all those sorts of issues, would you deal with that? Absolutely, Your Honor. We, the plaintiff's position is that the discretionary function test does not call for precisely the same kind of analysis as the clearly established law test for qualified immunity purposes for a number of reasons, both legal and policy matter. The legal analysis as articulated is different. There is no clearly established law test that is bound up with the discretionary function test. We don't have any quarrel with the United States' idea that a constitutional right has to be, the mandate has to be specific and intelligible, but neither are plaintiffs claiming violations of the Ninth Amendment here either. We're claiming violations of constitutional mandates that were specifically articulated by Farmer. Now this Court has already held in this case that the constitutional rights were not clearly established or the constitutional mandate was not clearly established. A position with which you disagree, but it did not. A position with which I disagreed with, and still do, but I don't, you know, it is what it is. You did argue the biblical case. They did not. Yes. Well, so, but given that. Well, let me ask you, there is case law, not from this circuit, that says that the Federal Tort Claim Act and Bivens are supposed to be coextensive. We can take that too far, but there is at least some practicalities to making those two doctrines, statute and doctrines, fit together, else there is, you know, not a lack of equilibrium between the two, which of course you would favor, but isn't there some common sense to saying that the way Bivens works, the clearly established doctrine under 1983, qualified immunity, would also fit under the Federal Tort Claim Act? I would argue no, as you might expect, and the reason is, and I had mentioned before that there were policy reasons for separating out these two strands of argument. With Bivens, and with the clearly established law test that goes with qualified immunity, you're talking about liability for individual federal officials. It is understandably important that before you attach liability to individual federal officials, you want to make absolutely certain that those federal officials could not possibly, under Morgan v. Swanson, inescapably needed to, you know, had fact patterns in front of them that clearly established that what they were doing was wrong. Under the discretionary function test, you're not talking about attaching liability to individual federal officials. You're talking about attaching liability to the United States, and there it makes sense to allow for a certain amount of evolution in research, evolution in the facts, patterns that might emerge over time. We would argue that, for example, the enactment of PREA in 2003 and the adoption of PREA standards in 2007 by ICE constitute just that kind of progression in research that the courts should take into consideration. It might not. There isn't a whole lot of clearly established law prior to, say, 2007 that talks about the kinds of things that PREA is talking about. And yet, if you hold the discretionary function test to the same standard, you never allow constitutional rights to emerge. Farmer v. Brennan simply talked about, didn't specify exactly what things in it were, should be considered to be the only things that a court should take into consideration in determining how to infer whether an individual knew about the substantial risk of serious harm. Rather, Farmer v. Brennan gave examples. Well, as research moves along, as we understand more and more about how these things emerge, it makes sense that under Farmer v. Brennan, there will be more examples. There will be more things that will count as signs of obvious risks that a federal official should make the reasonable inferences from. So, for example, in the plaintiff's complaint, we talk about the adoption by ICE of PREA in 2007. And in that adoption, in the policy statement that outlines what that is, ICE specifically says, research has shown that a small percentage of men have certain kinds of aggressive tendencies and have a tendency to violate or to commit vile actions with respect to women, given the opportunity to do so. Well, that wasn't the, previous cases had talked more about the kinds of culture that you might expect at a facility, the kinds of, you know, the history of one particular individual who might have committed certain kinds of acts. But what PREA understood, what ICE understood as of 2007, is that you may not always know. There's a certain percentage of men that have these kinds of tendencies. You're going to run into them, okay? In this case, we had 22 guys who, over time, were transporting these women without any kind of accompaniment. Eventually, you're going to run into that guy who has one of these kinds of tendencies that PREA is talking about, that ICE is talking about on that standard. Let me shift gears again and go back to the diversity issue that Judge Costa was asking about earlier. You know, one of the things that you have to do is plead jurisdictional facts when you plead diversity. It's not enough just to say, I invoke diversity jurisdiction. I know you say in the brief that the plaintiffs were not lawfully present in the United States, and the statute does say that you have diversity when you have citizens of a state who are not lawfully present in the United States, but it also says that the court does not have original jurisdiction between citizens of a state and citizens or subjects of a foreign state who are lawfully admitted for permanent residence and are domiciled in the same state. And, you know, looking at the complaint, I guess I'm wondering what your response would be as to whether the third amended complaint sufficiently pleads jurisdictional facts. You know, you say, for instance, that Plaintiff Sarah Doe is a native and citizen of Eritrea, but then also later you say that she reached the airport, left the state of Texas, and now resides elsewhere in the United States. Is that enough to show that she was not lawfully present in the United States to plead that? And I also don't see where the citizenship of some of these individual defendants is identified. CCA is identified as a citizen of Maryland, I think, and Tennessee, if I recall correctly. So is that enough to establish, one, as a matter of pleading jurisdictional facts, that these individuals were not lawfully present, or even if they were, were they living in maybe a state other than Texas, but what other state was that? Was it not Maryland? Was it not Tennessee? Was it not the state of citizenship of some of these other defendants? And so I guess I have a question there about when we talk about this issue of diversity, whether even if the district court didn't say anything about it, are there enough facts pled to establish diversity? I think that there are, Your Honor, because with respect to what the statute says in 1332 A.2 is that the district court shall have original jurisdiction between citizens of a state and citizens or subjects of a foreign state, and then it's got a proviso, but I think it alleges that all of the citizens, all of the plaintiffs are citizens or subjects of a foreign state, and then the only question is, were they lawfully admitted for permanent residence in the United States, and are domiciled in the same state? So the domiciled in the same state doesn't go to the original issue of jurisdiction, it only goes to whether there's a, whether this exception operates, and so the domiciled in the same state issue would only matter if the, if these plaintiffs were lawfully admitted for permanent residence, and so I think the complaint successfully alleges or properly alleges that they had not been lawfully admitted because the only kind of visa that even some of them had achieved at that point was a U visa, and a U visa doesn't, is not the kind of mechanism that allows for permanent residence in the United States. I have a feeling you may have more to say, we've asked you a fair number of questions and you haven't covered a lot of your, I'll give you two more minutes, which may sound like almost nothing, but can you provide us with something you want to provide in the next two minutes? Yes, absolutely. With respect to the, the Corrections Corporation of America issue, I think that the, this issue boils down to, is it possible to say that just because a, a detainee is federal, that therefore any entity responsible for detaining that individual is therefore a federal actor and cannot be a state actor? And I don't think that's possible because, for one thing, it would turn Williamson County itself into a federal actor and not a state actor. It would, under circumstances in which only the, the county is operating in this capacity, it seems absurd and anomalous to suggest that the federal court, or sorry, that the status of the federal prisoners itself would decide that issue. I will, I will turn the, the court's attention to Lewis v. Downey, a Seventh Circuit case in which the Seventh Circuit expressed doubt as to whether a contract of this kind could possibly change the status of county employees as state actors for Section 1983 purposes. I will also turn the court's attention to the recent Naranjo v. Thompson case, that's Fifth Circuit 2015, where the, this court commented on this very issue, saying, noting the conflict in the Western District of Texas on this precise issue, saying, were we to address this question, we would likely need to seek input from the Bureau of Prisons. Well, whatever exactly that might mean, it surely can't be the case that the Fifth Circuit was willing to say that it just turned on the issue of the federal status of the prisoners, because you wouldn't need to ask the Bureau of Prisons about that. That's a simple question of law. I'm out of time. Thank you. Good morning. I'm Nicholas Aceto, and I am arguing first on behalf of Corrections Corporation of America and Evelyn Hernandez. And the issue on appeal as it pertains to those defendants is whether they were acting under color of state law or under color of federal law. Let me pick up on what Opposing Counsel was just saying. And I didn't actually read the district court so much as saying it was the status of the detainees as much as it was the function here, which was immigration detention, and that's a federal function, everyone pretty much agrees. But what if there was only one level of delegation? What if they just delegated to Williamson County, not down to your client, and Williamson County just put these immigration detainees in their county jails and something happened and they sued a county sheriff official? Would they be a state or federal actor? Because if you look at the purpose, it's still immigration, so how would you resolve that kind of situation? That's a closer situation to the Henderson case and the Alvarez case, actually. We would need more information. Did that county or city jail also house county or city inmates or pretrial detainees? And I think if that were the situation, if it was already a preexisting facility, state-run, state-owned, county-owned, city-owned facility that was performing that function, and then the federal government came along and said, hey, can we stash inmates at your facility as we're transporting them, or if they have a hearing in your jurisdiction, I think in that instance, under Henderson, at least, this court's decision in Henderson, they would still be considered state actors. Now, remember, in Henderson, that was a city jail. In Alvarez, it was a county-owned jail. And in Alvarez, it was just operated. But they were just prisoners face, people who were jailed facing prosecution, which can be a state function. I mean, immigration, I think the thrust of the district court is immigration is a special federal function. That's correct. And that's what really sets our case apart from the Henderson and Alvarez line of cases. Those were federal prisoners, and in our case, they are ICE detainees, and it was in a facility, the only function that that facility, the only function of that facility was to detain ICE detainees. It didn't also have county, city, or state prisoners. It was, the sole purpose was to house these female detainees. And we agree with the plaintiffs that the focus of this increase should be on what the function that they were performing. We never said that because of their title, their status as ICE detainees, that automatically makes them a federal actor. No, you look at the function, and that's what West v. Atkins tells us, and that's what Henderson tells us. And if you look at the function, as you just noted, Judge Costa, that authority derives solely from federal law. We've quoted the Medina case that is a fundamental sovereign attribute exercised exclusively by the federal government. And that is only made possible because of the Immigration and Nationality Act. And because that was their sole function, detaining alien detainees pending a determination of their removal. They can only be characterized as federal actors. Now, the plaintiffs, they don't seem to dispute that. In their briefing, in their reply brief, they actually admit that that is a federal function. But they're floating out this theory that you can actually serve two purposes at the same time. And they didn't cite any authority to support that proposition. We cited authority that refutes that, and frankly, it's common sense that for purposes of 1983 or Bivens liability, you can only be one or the other. You can only be a federal actor or a state actor. I believe the question was posed to plaintiff's counsel when he was up here. What if, would Williamson County, it would be absurd, under our reasoning, Williamson County would be dubbed a federal actor. Well, I don't think that that's so absurd. First of all, that's not an issue in this case. Williamson County didn't make that argument. But under the circumstances of this case, when you've got a purely federal function, and the federal government contracts with even a county. If it was, if Hutto was a county-owned facility and there were no county detainees or county pretrial detainees or prisoners, I think an argument could be made that Williamson County was a federal actor, and I don't think that that is absurd. I think that follows the, I think that follows Westford versus Adkins when you look at what the test is and you focus on the function. I think Henderson, which is a slightly different case, it throws a wrench into it because those facilities served a dual purpose, state and federal detention. So to answer that question, I don't think that that's out of the realm of possibility. But again, we have a much cleaner case, we have a much similar case that sets us apart from Henderson and Alvarez. They were only housing ICE detainees. Counsel had mentioned the Naranjo case. That case, again, it was in line with Henderson and Alvarez. It was a facility that housed both federal prisoners and state prisoners. So that is a different case, and that's not something that this court, that this court is grappling with today. I would like to point out one case was not cited in the brief, but it is persuasive. It's an unpublished decision, it's Mendoza versus Strickland. And in that case, involved federal pretrial detainees that were housed in a county-owned facility, and the county then subcontracted with a private prison company through an IGA. Similar to this case, it didn't involve ICE detainees. Those were federal pretrial detainees. And in that case, the court held because Mendoza was housed in a federal detention facility, Section 1983 does not apply. So if we're looking for a case that was more analogous, I would point to the court to Mendoza versus Strickland. The citation is 414 Federal Appendix 616. And that case, I think, follows a prior line of cases, Sandoval versus Wackenhut. It's also an unpublished decision, but it's persuasive. And the most recent case, El-Tayyib versus Cornell Companies, incorporated 533 Federal Appendix 414. That was a situation where there was a federal prisoner housed at a federal detention center, also operated by a private prison company. And all of those cases essentially look to the function that was being performed. And when it is purely a federal function, and in this case, the detention of ICE detainees, they can only be characterized as federal actors. Unless the court has any other questions, I'll turn it over to counsel for Dunn. We'll take it back. Thank you. Thank you. May I please the court? My name's Allison Bowers, and I'm here today representing Donald Dunn. The legal issues as between Donald Dunn and CCA are identical. In this appeal, the parties filed a joint brief. And so, the issues—you look confused, Judge. You hadn't noticed I probably have looked confused all morning. Go ahead. So, we filed a joint brief, and the issues are exactly the same. Procedurally, there's a little bit of a difference. I don't think it is relevant or that it matters, but for purposes of sorting out this kind of unwieldy record, let me just explain that the Section 1983 issue in regard to CCA came up on a motion to dismiss. The magistrate issued a report and recommendation, and Judge Yackel eventually adopted that. After Judge Yackel adopted that report, Donald Dunn, we filed a motion for summary judgment and essentially made the point that for all the same reasons, the court ruled that CCA was not a federal actor, or a state actor, then Dunn is not a state actor. In your joint brief, I do think at the end you basically conceded that the state claims should be sent back for the court to sort out the jurisdictional issue. Yeah. Unfortunately, there's no indication that Judge Yackel considered the diversity issue. I think, as has been pointed out, there are some issues that may need to be sorted out, and perhaps that's most appropriately done at the district court level. The only thing I will add on the 1983 claim that my co-counsel did not have a chance to discuss is the Guzman v. Martinez case. That is a district court case out of the state of Arizona, so obviously it's not binding on you all, but the facts are almost identical to what we have here. There was a contract. It went from ICE to the city and then to CCA, and the court had a very good analysis as to why CCA was not a state actor in that case. Thank you. Thank you. Mr. Sturgill. Good morning. May it please the Court. I'm Lowell Sturgill from the Department of Justice representing the United States. I'd like to begin by discussing the questions that Judge Southwick asked my friend about the Federal Tort Claims Act, and there are two basic responses I want to give you. First, the plaintiff agrees that for a constitutional duty to vitiate the discretionary functional exception, the duty must be specific and intelligible. That's what he says. He believes that his mere citation of the Supreme Court case Farmer v. Brennan satisfies the test that he agrees applies, but that's not right and it can't be right. Now, Farmer, as you know, holds that the government violates the Eighth Amendment if it shows deliberate indifference to a serious risk of harm. Now, that, of course, is defined at the most broad level of generality possible, and he says in his view that's specific enough, though, but really that's just saying like the Fourth Amendment precludes unreasonable searches and that's specific enough. Now, he sort of in his brief, as you look at it, we've made the point that if you accept that argument, then really a plaintiff could vitiate the discretionary function exception just by merely alleging any constitutional violation. He says that's not the case, but again, he defines specific and intelligible at such a broad level of generality that that's what it amounts to. My concern, as justified as it may be, is it clearly established is an awful long way the opposite direction. If that is the test we should apply under the FTCA, what do you say to that? Well, I think actually the qualified immunity test, both in terms of its policy and purposes and how it plays out, maps very well onto discretionary function exception. Both of those exceptions are designed to allow government employees to do their jobs without the fear in the Bivens context that they'll be held individually liable for what they do or in the discretionary function context that the government will be held liable for what they do. Isn't that a much different context, individually liable versus the government being liable, which makes me wonder if that's the right test to apply on the FTCA? I mean, I'm forbid for us to come up with a brand new test, but no one else has said clearly established applies. Correct? Well, actually, two judges of this court in individual opinions have said that. Excuse me. Holdings of circuit court. And the Roger – well, Roger says specific and intelligible. You're right. There are no other cases that say that, but again, I think the plaintiff hasn't come up with any principled difference in how those tests would work out if you apply them. And again, it seems to make sense that they – I don't know why there is a difference between the two. The only difference is the personal liability versus government liability. But again, both of those doctrines, as the Supreme Court explained in Vera Gara lines and then the discretionary function cases like Berkovitz, those doctrines are both intended to allow the government employees to do their jobs. And it's no less important in the discretionary function context for the United States in terms of its interest to have its government employees be able to do their jobs without the fear that it's going to bring on a lawsuit for damages as it is for the individual person. There is one difference between the two I wanted to just point out, though, and that's that under the discretionary function test you, of course, have a two-part inquiry. The first question is whether there's a mandatory duty. And that's where we believe that the qualified immunity principle maps directly on to discretionary function. But there is a second part, and that is whether the question is susceptible to policy analysis as a type of question that discretionary function was intended to protect. And in that kind of a context, we note that the plaintiff has not made any argument in his opening brief or his reply brief that the second part of the discretionary function test is not satisfied here. So we think he's not preserved that question here. But even beyond that, if you think about it, the notion that a constitutional duty can create a mandatory duty, well, the Constitution talks in very broad and general terms about the broadest possible policy in large affairs of state. And to think that those kinds of questions would not be the type that are susceptible to policy analysis strikes us as very unlikely. And, again, you don't have to reach that here because he hasn't argued, but that would be the difference between the two doctrines. And I could see an opinion that would say, well, these are the same in terms of the first prong of discretionary function. That's where the discretion, the mandatory duty is relevant. And then the second prong is, again, well, is it the type of claim? And you could save that for another case where they've argued it. But, again, it's unlikely, it seems unlikely to me that there would be a case where there's a mandatory constitutional duty that isn't susceptible to policy analysis. I've used my time. I appreciate your explanation. Thank you. May it please the court. Jeff Hobbs for the appellee, Williamson County. I want to make two points in support of affirmance of the district court's summary judgment in favor of the county. The first involves the requirement that appellees show a pattern of prior sexual misconduct in order to satisfy the deliberate indifference prong of their 1983 claim. And the other addresses the evidence that they heavily rely on in their claims against the county and other appellees, which are the transport logs showing detainee transports from the Hutto facility. First, addressing the requirement of a pattern of prior misconduct. Just last year in Mason v. Lafayette, this court recognized that it's, quote, a virtual impossibility, unquote, to impute a lax disciplinary policy to a municipality without a showing of a prior pattern of abuses. And in this case, the summary judgment record does not overcome that virtual impossibility. In the brief, the appellees characterize a history of sexual misconduct at the Hutto facility, and I submit that is a liberal one at best because the only evidence of this history is a single incident that is shown in the record in 2007. Well, that single incident cannot establish deliberate indifference because it is not fairly similar to what ultimately transpired, which the court recognized was required to show a pattern of prior violations in the state of Davis versus city of North Richland Hills. And more recently in the court's prior opinion in Doe v. Robertson that the panel has already acknowledged, the court acknowledged that 2007 incident did not stem from any persistent risk related to detainee transport. So even if that one single incident could establish deliberate indifference, it's not related to the misconduct that involved the appellants in this case. So in the absence of a prior pattern of sexual assault or misconduct at the Hutto facility related to detainee transports, there is no fact issue in deliberate indifference. My second point addresses the issue of the detainee transport logs, which the appellants heavily cite in their brief. Again, the opinion in Doe v. Robertson is instructive. There the court examined allegations that ICE officials knew about those transport logs and willfully ignored the fact that those logs reflected that officials, unaccompanied male officials were transporting female detainees from the Hutto facility. And the court held that, quote, such facts must be more indicative of an actual substantial risk of harm than are the violations of contractual terms designed to minimize harm. So in other words, it's not sufficient just to show a mere violation of policy with no resulting history of misconduct. You have to show more. And in that opinion, the court actually gave hypothetical facts that might provide the something more than just the policy violations. For example, they posited whether or not there could be knowledge of prior incidents of transport-related misconduct, whether or not there might be concerns or fears that were voiced by prior detainees, and they also considered whether or not there was any history of prior misconduct by the defendant Donald Dunn. There is no evidence in the summary judgment record in this case of any of those hypothetical facts. And moreover, I submit in this case the summary judgment posture in the record is one step removed from the situation that the court rejected as implausible pleading facts in Doe. In Doe, as you recall, the appellants alleged that ICE officials had knowledge, specific knowledge of the transport logs. Here, after a fully developed summary judgment record, there is no evidence that the county knew of those violations. So we are one step further removed from the situation that the court rejected for liability against the ICE officials in Doe. If you choose the policymaker, just the county commissioners, who would have to have that knowledge of the transportation logs? Well, I think the court's precedents show you have to have an official, and here the only official that I think the summary judgment record establishes as a likely candidate would be the monitor, John Foster, who was there and visited the facility. Do you agree he's a policymaker for a 1983 purpose? I think he could be as one who was actually on site and took any actions or could have taken any actions with respect to reporting that issue back to the county. Again, I don't think there's any evidence that shows that the commissioner's court actually gave him any decision-making policy, and in fact the only evidence of policy in this case is the ICE contract, which was incorporated and strictly mandated to the contract between the county and CCA, which said strictly there must be one member of the same sex in any transport with a female detainee. So I think that addresses the issue of the policy and policymaker there. So my time is up, so thank you. Thank you. I'm going to have to be quick. With respect to Williamson County, a number of issues, problems with the argument that they present. One is most of the cases they cite are based on Farmer v. Brennan, but Farmer v. Brennan doesn't apply to municipality section 1983. It does not state the deliberate indifference test for that. Rather, City of Canton v. Harris does, which is an objective test, not a subjective test. Even if Farmer did apply, the whole point of calling for knowledge of a heightened risk of sexual assault at a particular facility is the idea that the fact finder is trying to draw inferences as to whether the municipality knew or whether the actor knew. But there's testimony in the record that the actor, at least the Williamson County actor, Sergeant John Foster, did know. His own testimony says, violations of the contractual provision would amount to playing with the lives of female detainees and lighting an open flame with a gasoline tank next to it, and that it would so obviously increase the risk of sexual assault. So there's no need to draw an inference, which is the whole point of that aspect of Farmers, because we know he knew. He says it himself. And then, finally, with respect to Williamson County, the issue of making policy is, I think, addressed in the briefing by the Ancona case, the West v. Adkins case. You can't just say, go do the right thing to whomever you delegate your constitutional responsibilities to. You have to actually look at it. You have to actually make sure they are. Otherwise, you're adopting their problematic policy. And I think a good case that addresses this issue is Bodie v. City of Fortune out of the Central District of California, in which a county delegated the task of pat-down searches and said, well, it has to all be done by the same sex. But then it wasn't done at all by the same sex, an actual practice by the organization that was doing it, but the city was held liable under Section 1983 because they did nothing to monitor. And the failure to monitor can be deliberate indifference under the objective test prescribed by a city of Canton. With respect to the CCA argument, I will simply note at this point that the difference between the function of a facility and what detainees are actually housed at a facility is not the kind of distinction that is raised in Henderson v. Thrower. It's not the distinction that's raised in the Alvarez v. Geo Group case. It's not the kind of distinction that's raised in the Naranjo case. In fact, what the Fifth Circuit in the Naranjo case said was the issue that isn't before the court but might be at some point is whether private companies managing county-owned prisons, housing federal prisoners, are proper Section 1983 defendants. That's the issue as articulated by the Fifth Circuit in Naranjo, and that's the issue that the plaintiffs have brought to bear today. Is it enough to say that just because these are federal detainees that that automatically makes anybody that is dealing with them into a federal actor as opposed to a state actor? Note, by the way, that it is not the same to say that you can't bring a Bivens claim and a Section 1983 claim at the same time. That's not the same thing as to say that you can't be a federal actor and a state actor at the same time because federal courts have not wanted to extend Bivens. Federal courts do not want to make more out of Bivens than just the kind of narrowly defined regime in which the person who is going after a Bivens claim has no other remedy. And so if you had a Section 1983 remedy available to you, you wouldn't want to give that same person a Bivens remedy. If that person had any kind of remedy available to them, you wouldn't want to give them a Bivens remedy. But that's not analytically the same as to say that that person couldn't have been a federal actor and a state actor at the same time. With respect to ‑‑ I have 18 seconds left. A summary. The Department of Justice, by saying that Farmer does not provide a specific and intelligible test, what Farmer does do is to say, were there facts from which the inference could be drawn that a substantial risk of serious harm exists? That's neither general nor unintelligible. There might be gray areas, but Plaintiff's argument is that in this case there's no gray area, that that provides a specific intelligible mandate. If you're a federal official and you know that there's a contractual provision out there that says, you know, you've got to have a female accompaniment to this ‑‑ to any transport of female detainees, you know that the reason for that is because there are ‑‑ there's a danger of increased risk of sexual assault. You know that they're because of ICE policy. You know that there's a certain number of people out there that do this kind of thing, and yet you're sitting there scheduling transports for the wee hours of the morning in the caged back of the van on these desolate roads for these women who have, you know, no understanding of the law, no understanding of their rights, no understanding of how they could possibly escape from this situation. You've got a mandate issued by Farmer, by the Supreme Court in Farmer. It's not general and it's not unintelligible. You ought to know. They did know. Thank you, Your Honor. Counsel, a well‑argued, well‑briefed case by all parties. We appreciate your being here to help us understand it. I think I've seen this case before. That doesn't mean the result will be the same. We are in recess until tomorrow morning.